# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| SANDRA R. PERRY, | * | |
| | * | |
| v. | * | Civil Case No. ELH-17-3619 |
| | * | |
| STATE OF MARYLAND, *et al.* | * | |
| | * | |

**\*\*\*\*\*\*\*\*\***

# MEMORANDUM OPINION

In this employment discrimination case, plaintiff Sandra R. Perry has sued the State of Maryland (the "State"), the Maryland Department of Health ("MDH" or the "Department"), and the Deer's Head Hospital Center ("Deer's Head"), alleging retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*.[1] The parties agree that the three remaining defendants should be treated as a single defendant, because the Department is a principal department of the State, and Deer's Head is operated by the Department. *See* ECF 28-1 at 20; ECF 31 at 23-24; *see also Bd. of Educ. of Prince George's Cty. v. Town of Riverdale,* 320 Md. 384, 388-89 (1990) ("State agencies exist merely as the State's 'hands or instruments to execute [the State's] will....'") (quoting *Baltimore v. State*, 173 Md. 267, 271, 195 A. 571 (1937)). Therefore, I shall refer to the defendants collectively as the "State."

After the conclusion of discovery, the State moved for summary judgment (ECF 28), supported by a memorandum of law (ECF 28-1) (collectively, the "Motion") and numerous

---

[1] Plaintiff's Complaint named other defendants and asserted other counts, but all of her other claims were dismissed by United States District Judge Marvin J. Garbis on March 7, 2018. ECF 16. Her Title VII retaliation claim against the State (Count III) is the only claim remaining. The case has been reassigned to me due to the retirement of Judge Garbis.

exhibits. Plaintiff opposes the Motion (ECF 31, the "Opposition"), supported by voluminous exhibits. Defendants have replied. ECF 33.

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105(6) (D. Md. 2018). For the reasons that follow, I shall grant the Motion.

## I.     Factual Background[2]

Plaintiff began working as an agency procurement associate at Deer's Head in 2009. ECF 31-1 at 4. During the time leading up to the events described herein, Beth Perdue served as plaintiff's direct supervisor, although her supervision consisted primarily of approving plaintiff's timesheets and leave requests and completing her performance evaluations. *Id.* at 5. Plaintiff and Ms. Perdue essentially worked side by side, in adjoining offices, and each worked on and approved her own procurement contracts. *Id.* at 5-7. Ms. Perdue was supposed to approve plaintiff's contracts. But, prior to October 1, 2015, she authorized plaintiff to use her approval authority and approve her own contracts. ECF 31-3 at 5; ECF 31-2 at 8; ECF 31-11 at 4.

The Department head, Ken Waller, functioned as Ms. Perdue's direct supervisor. ECF 31-1 at 5. Either Mr. Waller or Ms. Perdue would determine whether Ms. Perdue or plaintiff would handle an incoming contract. ECF 31-1 at 6.

On October 1, 2015, plaintiff received a sexually explicit email at her work email address. *Id.* at 9. The sender's name appeared as "johnjohn leggs" with the following email address: leglover13@hotmail.com. ECF 28-11. The email said, *id.*:

---

[2] The Factual Background is derived from the exhibits submitted by the parties, including various declarations and deposition transcripts. For the purpose of this Motion, the facts are viewed in the light most favorable to Plaintiff. *See Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) (noting that summary judgment is only appropriate if the Court finds no genuine issue of material fact after "viewing the evidence in the light most favorable to the non-moving party").

are you an exhibitionist? love those short skirts and your long legs. when you bent over your cheeks looked great. do you go commando? my picture says so? need more personal contact. you might agree by sending me proof and if you shave. I know you don't want this circulated.

Ms. Perry showed the email, on her computer screen, to Ms. Perdue and Mr. Waller. ECF 31-1 at 9. Mr. Waller discussed reporting the incident to the Deer's Head Information Technology ("IT") Department. *Id.*; ECF 31-2 at 9. After doing some online research, plaintiff believed that the email address leglover13@hotmail.com was associated with Ms. Perdue's husband, Allen John Perdue. ECF 31-1 at 9. Mr. Perdue did not work for Deer's Head or for the State in October 2015. ECF 28-9 at 7. Plaintiff forwarded the information she had discovered about Mr. Perdue and the email address to Mac Beattie and Phil Adkins in IT. ECF 31-1 at 10.

Plaintiff also reported the email to Luanne Dashield in the Human Resources ("HR") Department at Deer's Head. *Id.* at 11. While plaintiff was in Ms. Dashield's office to report the incident, Mr. Waller and Mr. Beattie, from IT, arrived to discuss the matter with Ms. Dashield. ECF 31-9 at 3. Ms. Dashield suggested that plaintiff contact the police about the email, and offered to walk plaintiff to her car after work. ECF 31-1 at 11, 12; ECF 28-13 at 7-8.

On October 5, 2015, after plaintiff took some time to think over the situation, plaintiff asked to have a joint meeting with Ms. Dashield and Ms. Perdue, although she did not wish to hold the meeting that day. ECF 31-1 at 12. Ms. Dashield advised plaintiff that she preferred a one-on-one meeting. She met alone with Ms. Perdue on October 6, 2015, to advise her that the email had likely come from her husband, and to ask Ms. Perdue to tell her husband not to come to Deer's Head. *Id.* at 12-13. Ms. Perdue subsequently reported that her husband had agreed to stay away. ECF 28-13 at 11; ECF 31-2 at 10. Ms. Dashield also informed the front desk at Deer's Head that Mr. Perdue should not be allowed into the building, and that any strange telephone calls should be reported to her. ECF 31-9 at 3, 4.

In October 2015, following Beattie's investigation into the email, Beattie informed plaintiff that he had not been able to identify "the owner of the email address . . . ." ECF 31-1 at 13. Plaintiff characterized Beattie as "dismissive." *Id.* She also referred the email to the IT Director for the entire Department, who could not "confirm" the sender's identity. *Id.*

Plaintiff did not immediately report the incident to any outside authorities. In early to mid-November of 2015, plaintiff went to the Maryland State Police to report the email incident, and to the state District Court in Salisbury to seek a protective order against Mr. Perdue. *Id.* at 14-15. The judge told plaintiff that the time to report the incident had expired; she had to apply within thirty days of the harassing email. *Id.* at 15.

After the incident, the working relationship between Ms. Perdue and plaintiff became strained. ECF 31-1 at 15. Plaintiff asserted that Ms. Perdue was "avoiding conversation" and had altered her body language. *Id.*; ECF 31-12. On October 30, 2015, plaintiff asked Ms. Dashield and Mr. Waller to change her supervision so that she could report directly to Mr. Waller. ECF 31-12; ECF 31-1 at 16. Before receiving a response to her request, plaintiff sought the assistance of a union representative, Caroline Davis. ECF 31-1 at 16. On November 14, 2015, plaintiff, Ms. Davis, Mr. Waller, and Ms. Dashield met to discuss the possible change in plaintiff's line of supervision. *Id.* at 16-17.

After some additional discussions, on November 24, 2015, Ms. Dashield wrote a letter to plaintiff advising that although "neither Deer's Head management nor the DHMH Office of Equal Opportunity Program can pinpoint tangible evidence of a hostile work environment created by Mrs. Perdue, we can empathize with your feelings and concerns and have carefully considered your request to not be supervised by Mrs. Perdue. Unfortunately, we are unable to carve out any procurement work here for you since Mrs. Perdue is involved in all aspects of purchase orders,

contracts and management of supplies." ECF 31-15; *see also* ECF 28-13 at 12-18. The letter went on to state that Deer's Head "can, however, accommodate a temporary assignment" by having plaintiff report directly to Mr. Waller, beginning November 30, 2015, performing timekeeping tasks while another employee, Alysia Pinder, took leave. ECF 31-15. In addition, the letter stated: "It is our hope that before Ms. Pinder's return, a position more suited to your experience will be found." *Id.* Ms. Dashield added that "a physical separation will be beneficial," and indicated that a workspace would be provided for plaintiff "on the north wing on the third floor in the currently vacant nurses' station." *Id.*

Plaintiff told Ms. Dashield that she did not view the proposed arrangement as satisfactory. ECF 31-5 at 3. She described the "timekeeping" duty as "clerical" and a "lower-level, data entry position . . . ." *Id.* In her view, she was being punished when she was the victim. *Id.*

Keneithia Taylor, the Executive Director and Fair Practices Officer of the Office of Equal Opportunity Programs at MDH, emailed plaintiff on November 24, 2015, stating: "Please advise what it is you are seeking, as I believed the most critical component of your request was removing you from Beth Perdue's chain of supervision, which is what the facility has done. . . We have reviewed many possibilities, locations, positions, and duties to assist you. If you have another suggestion, please feel free to share it." ECF 31-16 at 2. Taylor also said: "What we do know is that someone sent you a repulsive email and there is a high assumption that is was [sic] Beth's husband . . . . However, you rejected DoIT's offer to look further into the matter." *Id.*

Plaintiff again expressed her desire to be transferred to Mr. Waller's supervision, without changes to her job tasks or location. ECF 31-16 at 3-5. However, Ms. Dashield sent a letter to plaintiff on December 4, 2015, stating: "After careful consideration of your concerns, the issues involved, the current distribution of procurement tasks, and a desire to minimize conflict in the

workplace, Deer's Head Hospital Center feels that the original plan for resolution of the matter is the most appropriate for all parties involved at this time." ECF 31-17. The letter directed plaintiff to "report for duty at 7:30 am December 7, 2015 to perform the temporary assignment of timekeeping while Alysia Pinder is on leave. Your earnings and job classification will not be impacted by this assignment." *Id.* At some point, a decision may have been made not to move plaintiff to the third-floor workspace, but no new workplace had been chosen for her timekeeping assignment. ECF 31-14 at 3.

However, on December 6, 2015, before plaintiff began the temporary timekeeping assignment, she requested and received leave under the Family and Medical Leave Act ("FMLA"), due to stress. ECF 31-1 at 18. On February 11, 2016, while on FMLA leave, plaintiff filed an EEOC charge in which she alleged that she had suffered sex discrimination and retaliation after reporting the email of October 1, 2015. ECF 28-24.

Plaintiff's FMLA leave lasted approximately twelve weeks. ECF 31-1 at 18. While plaintiff was on leave, the procurement department began cross-training other employees to handle procurement tasks, and made some changes to procedures for handling certain contracts and assignments. ECF 28-7 at 9-10, 15; ECF 31-9 at 7. For example, on February 26, 2016, Ms. Perdue sent an email stating that all requests for purchase orders had to be sent to her, not to any other employees. ECF 31-18. Ms. Perdue testified that the purpose of the change was so that she could keep track of all of the projects and assign appropriate ones to the person in training, RJ Coulbourn. ECF 28-6 at 14-15. The email also noted that Ms. Perdue's office door would remain closed, and employees would be unable to cut through to the business office. ECF 31-18.

Plaintiff was scheduled to return to work on February 29, 2016, to her original procurement position, under the supervision of Ms. Purdue. ECF 31-1 at 18. When plaintiff returned from

leave, she had no access to various computer files and programs required to perform her job tasks, a printer that had formerly been located in her office had been moved, and her State credit card had been terminated. ECF 28-7 at 11; ECF 31-4 at 4; ECF 31-1 at 18-19. Plaintiff's access to all of those items was eventually reinstated, except for the printer, because the agencies had moved to using copiers for printing in order to save costs. ECF 28-22, at 1-2; ECF 31-1 at 19; ECF 31-11 at 3.

Upon plaintiff's return to work, she was required to report the status of her contracts to Ms. Perdue, using a spreadsheet, every two weeks. ECF 31-1 at 20. Plaintiff described the new system as a change in "the functionality of the department from shared responsibility between Mrs. Perdue and me (working independently) to Mrs. Perdue now assigning and approving all work (increased supervision)." ECF 31-5 at 4.

In June 2016, Ms. Perdue completed plaintiff's personnel evaluation and rated her, overall, as "Satisfactory." ECF 28-23; ECF 31-5 at 5. Plaintiff's prior annual evaluations reflected ratings of "Outstanding." ECF 31-1 at 22.

Months later, on March 9, 2017, during an exchange about contract assignments, plaintiff sent an email to Ms. Perdue that stated, in relevant part, "After I filed my complaint of discrimination and retaliation after your husband's lewd e mail to me and your hostile behavior toward me because of it, you removed all of my contracts from the Contract log that we shared and you and Ken made it a requirement that you assign all contracts." ECF 28-25 at 2. Mr. Waller was cc'd on that email. *Id.* On March 15, 2017, Mr. Waller met with plaintiff to discuss the "tone" of the email, which he regarded as "negative." ECF 28-26.

On April 6, 2017, Ms. Perdue submitted paperwork announcing her intent to retire, effective December 31, 2017. ECF 28-27. The next day, April 7, 2017, Mr. Waller and Ms.

Dashield issued a "memorandum of written counseling" to plaintiff regarding the email she had sent to Ms. Perdue on March 9, 2017. ECF 28-26. Three days later, on April 10, 2017, plaintiff again took FMLA leave, citing stress, anxiety, and depression. ECF 31-5 at 5. On April 24, 2017, while plaintiff was on leave, Mr. Waller announced the upcoming vacancy and solicited applications to replace Ms. Perdue. ECF 28-14 at 17; ECF 31-22. Plaintiff did not hear of the process during the application window, and did not apply for the supervisory position. ECF 31-5 at 5.

Plaintiff was scheduled to return from twelve weeks of FMLA leave on July 5, 2017. ECF 31-5 at 5. Because she was not medically cleared to return by that date, the State requested a Task Analysis from her physician. *Id.* The State then scheduled an appointment with the State Medical Director, pursuant to the State's standard policy when an employee's FMLA leave has expired. *Id.*; ECF 31-9 at 12. The State Medical Director examined plaintiff on August 14, 2017, and again on September 7, 2017, following intervening psychological testing. ECF 31-26; ECF 31-27. In a report issued on September 7, 2017, the State Medical Director concluded: "[I]t is my impression that Ms. Perry is not likely psychologically fit to efficiently perform her job duties at her current location . . . It is my opinion that Ms. Perry will not likely return to work in her current position at Deer's Head Hospital Center in the near or foreseeable future." ECF 31-27 at 4. On October 7, 2017, citing the State Medical Director's opinion, the State terminated plaintiff's employment. ECF 28-28. However, plaintiff had applied for, and was granted, disability retirement. ECF 28-14 at 14, 21.

Notably, after the incident of October 1, 2015, plaintiff never saw Mr. Perdue at Deer's Head again. ECF 31-1 at 13; ECF 28-13 at 11.[3] The evidentiary record is also devoid of any further sexually harassing communications directed to plaintiff, either by Mr. Perdue or anyone else.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if

---

[3] Although the record indicates that Mr. Perdue may have driven his wife to work on certain occasions in inclement weather, no harassment resulted, and plaintiff was unaware of his presence. ECF 31-1 at 13, ECF 31-2 at 11.

it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. And, as indicated, the court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Haynes v. Waste Connections, Inc.*, ___ F.3d ___, 2019 1768918, at *2 (4th Cir. April 23, 2019); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile*

*Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III.     Title VII Retaliation

#### A.  Title VII framework

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).   Title VII also prohibits discrimination against an employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  *See, e.g.*, *Ray*, 909 F.3d at 669; *Netter*, 908 F.3d at 937; *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011). The purpose of Title VII's antiretaliation provision is to preserve "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

To establish a prima facie claim of retaliation, in violation of Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see Strothers*, 895 F.3d at 327; *Jacobs*, 780 F.3d at 578; *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

Notably, in the context of the first element, "an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful.'" *Boyer-Liberto*, 768 F.3d at 282 (citation omitted). However, the employee "must have an objectively reasonable belief . . . that a Title VII violation has happened or is in progress." *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 341 (4th Cir. 2006).

Here, the actions at issue concern an underlying claim of sexual harassment, and a claim by plaintiff that her employer retaliated in connection with that claim. The Fourth Circuit has said:

> To make out a claim for sexual harassment, the plaintiff must establish four elements: (1) the harassment was unwelcome; (2) was based on sex; (3) was sufficiently severe or pervasive to alter conditions of employment and create an abusive atmosphere; and (4) was imputable to the employer.

*EEOC v. Cromer Food Serv., Inc.*, 414 Fed. Appx. 602, 606 (4th Cir. 2011) (citing *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174-75 (4th Cir. 2009)); *see also Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

In general, there are "two avenues" *at trial* by which a plaintiff may prove a violation of Title VII. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015),

as abrogated on other grounds by *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 329 (1997)). The first avenue is direct or indirect proof of intentional discrimination. *Hill*, 354 F.3d at 284**.**

The plaintiff's second avenue is the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv. Inc.*, 135 S. Ct. at 1345 (construing the Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing the three steps of the *McDonnell Douglas* framework). The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).

Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). But, "a plaintiff asserting discriminatory treatment under Title VII may avoid summary judgment by proceeding under the burden-shifting framework established" in *McDonnell Douglas*. *Haynes*, *supra*, 2019 WL 1768918 at *2.

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "differing factual situations," *McDonnell Douglas,* 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against a plaintiff

"under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 Fed. Appx. 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit*

the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

## B. Retaliation claims

For convenience, I shall restate the elements of a prima facie claim of retaliation, in violation of Title VII. A plaintiff must "show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see Strothers*, 895 F.3d at 327; *Jacobs*, 780 F.3d at 578; *Navy Fed. Credit Union*, 424 F.3d at 405-06; *Price*, 380 F.3d at 212. "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

"[I]n the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937; *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for

opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259. This case implicates only the opposition prong.

"To fall under the protection of the opposition clause ... behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters*, 796 F.3d at 417 (internal quotation marks omitted); *see also Stennis v. Bowie State*, 716 Fed. App'x 164, 167 (4th Cir. 2017). "'Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII.'" *Stennis*, 716 F. App'x at 167 (quoting *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011)).

The plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the firing was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

In considering whether a plaintiff has engaged in protected activity opposing discriminatory conduct, though individual acts may be scrutinized to determine "their nature, purpose, and nexus to the alleged objective," the plaintiff's conduct must be examined "as a whole." *DeMasters*, 796 F.3d at 418 (emphasis removed). This inquiry first looks to whether the

employee "communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). If so, then the court evaluates whether the practice alleged to be discriminatory by the employee is "actually unlawful under Title VII" or, as noted, whether the employee "reasonably believes [it] to be unlawful." *Boyer–Liberto*, 786 F.3d at 282.

Critically, the employee's complaints have to relate to a discriminatory employment practice, because "Title VII does not protect general complaints of unfair treatment." *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 587 (D. Md. 2012); *see also Harris v. Md. House of Correction*, 209 F. Supp. 2d 565, 570 (D. Md. 2002) (declining to find protected activity where a plaintiff "merely complained of the unfair manner in which her superiors had treated her"). However, an employee's opposition constitutes protected activity where the employer understood or should have understood that the employee opposed an unlawful practice. *Burgess v. Bowen*, 466 Fed. Appx. 272, 282 (4th Cir. 2012). To determine whether an employer should have understood the complaint to constitute a protected activity, a court must consider the context in which the complaint was made. *Id.* (holding that the employee's verbal complaint of being "targeted" should have conveyed to the employer a concern of racial discrimination); *see Okoli*, 648 F.3d at 223–224 (finding that an employer should have understood that a complaint "likely encompassed sexual harassment" when the employee used the word "harassment" without further detail about the type of harassment alleged).

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In a retaliation claim, the standard

for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

Moreover, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Thus, even under the "lower bar" applicable to Title VII retaliation claims, the issuance of a personal improvement plan does not constitute adverse action. *Sillah v. Burwell*, 244 F. Supp. 3d 499, 517 (D. Md. 2017) (citing cases); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013); *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that the employer took the adverse action "*because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any

inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). *See Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Conversely, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

## IV.  Discussion

### A.  Allegations of Retaliatory Conduct Prior to EEOC Charge

Plaintiff proceeds under the *McDonnell Douglas* framework. ECF 31 at 25. Applying those standards, the actions plaintiff took prior to her filing an EEOC charge on February 11, 2016, did not satisfy the first element of the required prima facie case: "protected activity."

Pursuant to plaintiff's own timeline, ECF 31-31, prior to the filing of her EEOC complaint, plaintiff engaged in the following activity opposing the sexually harassing email: she reported the email of October 1, 2015, to her supervisors, the IT department, and the HR department; she requested to be removed from Ms. Perdue's supervision; and she reported Mr. Perdue's conduct to the Maryland State Police and the State District Court.

In regard to the elements of a sexual harassment claim, the offensive email was both unwelcome and sexual in nature. However, there is no basis by which plaintiff could have reasonably imputed the email to her employer.

Conduct of a supervisor is generally inputable to the employer. *Vane v. Ball State Univ.*, 570 U.S. 421, 424 (2013). And, harassment by a coworker is imputable to an employer if the employer knew or should have known about the harassment but failed to control the "working conditions." *Id.* at 424; *see also Freeman*, 750 F.3d at 423.

Imputing the actions of a non-employee to an employer is limited to situations where (1) "an employer should reasonably anticipate that a plaintiff may become a victim, but fails to take action reasonably calculated to prevent the harassment," *Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705, 717 (D. Md. 2005); or (2) the employer "had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action." *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (internal quotations omitted); *see also Freeman,* 750 F.3d at 423 ("[A]n employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'") (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995)).

Here, as discussed above, the State had no prior inkling that plaintiff might become a victim of sexual harassment by a non-employee, albeit the spouse of an employee. And, it took prompt remedial action upon learning of the offensive email.

Plaintiff cites *Cromer*, 414 Fed. App'x 602, for the proposition that the State can be held liable for the email "under a negligence standard." ECF 31 at 28. In *Cromer*, the Fourth Circuit considered a situation, like this one, in which non-employees were alleged to have engaged in sexually harassing conduct. *Id.* A route driver for Cromer Food Services was tasked with servicing vending machines at various clients' premises. *Id.* at 603. Two employees at one of Cromer's biggest clients, Greenville Hospital, began harassing the driver by making unwanted sexual comments and gestures to him on a daily basis. *Id.* The driver spoke to three of his supervisors and managers at Cromer, but they did not take any action to prevent the harassment. *Id.* at 603-04.

Eventually, the driver reported the harassment directly to the HR department at Greenville Hospital, and then to the manager of the two employees engaging in the harassing conduct. *Id.* at 604. Still, the conduct continued. *Id.* After months went by, the driver reported the harassment to the EEOC. *Id.* Upon receiving a letter from the EEOC, Cromer decided that the driver should be moved to a different shift, which would have different work hours and lower hourly pay, but would not involve work at Greenville Hospital. *Id.* at 605. The driver declined to accept the new shift and was terminated. *Id.*

The Fourth Circuit considered "whether an employer may be liable for the activities of non-employees in a claim for sexual harassment." *Id.* at 606. The Court determined that Cromer could be liable under a "negligence standard," because it "is liable if it knew or should have known of the harassment and failed to take appropriate actions to halt it." *Id.* at 607.

Under the standard enunciated in *Cromer*, the State would not be liable for the single harassing email sent to plaintiff in this case. Unlike *Cromer*, this case does not involve a persistent series of harassing events and repeated complaints to the employer. Instead, there was a single incident of sexual harassment from a person not employed by the State, but who is married to a State employee. There is no allegation that the State or anyone else could have anticipated the email of October 1, 2015.

Moreover, this case is readily distinguishable from *Cromer* in regard to the employer's response to the incident. In *Cromer*, the driver's supervisors failed to take any preventive actions and the harassment continued unabated. It is unwarranted to describe the State's actions in this case as "negligent," when the State could not have anticipated the single incident of harassment that occurred, and subsequently took action sufficient to prevent future harassing conduct.

Perry also cites *Boyer–Liberto*, 786 F.3d at 284, for the proposition that a single act of harassment can form the basis of protected opposition by an employee if the act is physically threatening or humiliating. In *Boyer-Liberto*, the plaintiff was working as a cocktail waitress at a hotel and a supervisor verbally abused her, twice using a racial slur when yelling at her. *Id.* at 269-70. The Fourth Circuit explained that the plaintiff's subsequent complaints about the supervisor's actions were protected activity because she reasonably believed that the hostile work environment was ongoing. *Id.* at 285.

In contrast, the offensive email in this case did not come from plaintiff's supervisor, or even a fellow employee. Thus, while in *Boyer-Liberto* the offensive conduct was easily imputable to the employer, *see id.* at 278, plaintiff here has not shown any basis for imputing the email to her employer. Nor has plaintiff shown any continued sexual harassment. Rather, she was unhappy with her employer's response to the incident.

This case is similar to *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757 (D. Md. 2010). Mr. Tawwaab, an African-American, worked as a route driver for Virginia Linen Service ("VLS"). *Id.* at 764-65. As part of his route, he delivered linen to the Wakefield Valley Country Club ("WVCC"). *Id.* at 765. After many deliveries to the club, VLS changed the terms of its arrangement with WVCC to require an upfront cash payment. *Id.* When Mr. Tawwaab notified the Caucasian manager of WVCC, Brian Walsh, that he could not leave clean linen until a cash payment had been made, Mr. Walsh became angry and, among other comments, threatened "a good old lynching." *Id.* Mr. Tawwaab contacted his senior management about the incident, filed a written statement to his supervisor describing Mr. Walsh's comments, and requested that he not be required to make future deliveries to WVCC. *Id.* VLS management assumed the responsibility of making subsequent deliveries to WVCC. *Id.* However, just two days later, Mr. Tawwaab's employment was terminated, and the parties "offer[ed] conflicting theories" about the reason for the termination. *Id.*

In considering Mr. Tawwaab's retaliation claim, the court determined that Mr. Tawwaab was "unable to show that he engaged in a protected activity." *Id.* at 772. Judge Williams reasoned, *id.* at 772-73:

> The Opposition Clause within Title VII states that an employee only engages in protected activity if he opposes an actual "unlawful employment practice," 42 U.S.C. 2000e-(3)(a), or an employment practice that the employee reasonably believes to be unlawful. *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). The test of whether an employee reasonably believes a practice to be unlawful is an objective one, and, as such, the issue may be resolved as a matter of law. *Id.* at 338-39. Defendants contend and Plaintiff concedes that, in the instant case, the only conceivable unlawful employment practice that Tawwaab could have been opposing was a hostile work environment created by Walsh's lynching threat. As such, Plaintiff would have to show that Tawwaab "complained about an actual hostile environment or, if there was not one, [that Tawwaab] could have reasonably believed there was one." *Jordan*, 458 F.3d at 339.

Judge Williams continued, *id.* at 773: "Even assuming, *arguendo,* that a hostile work environment existed or it was reasonable for Tawwaab to believe there was one, there is no basis for attributing Walsh's statement to VLS." *Id.* at 773.

Plaintiff points to a series of actions that she believes would have better protected her against further harassment. *See, e.g.*, ECF 31 at 28 ("Defendants took no action to block the email address"). However, the actions the State took in response to the email sufficed to protect her, because no further incidents of harassment occurred. For example, State employees requested that Mr. Perdue refrain from visiting Deer's Head, and advised the front desk staff to prevent his entry. ECF 28-13 at 7-8; ECF 31-9 at 3-4. By her own admission, however, plaintiff never saw Mr. Perdue after the date of the incident on October 1, 2015, nor does she allege any other harassing communications after October 1, 2015. ECF 31-1 at 13.

As to any conduct prior to plaintiff's EEOC charge, including the allegedly deficient computer investigation by Deer's Head IT, the alleged hostile or unprofessional treatment of plaintiff by Ms. Perdue, the decision not to permit plaintiff to be supervised directly by Mr. Waller, and the unconsummated decision to transfer plaintiff to the temporary timekeeping position on another floor, plaintiff has not established protected activity because, at the time those events occurred, she had not reported any conduct made unlawful by Title VII.

### B. Conduct after the EEOC Charge

Plaintiff filed a charge with the EEOC on February 11, 2016, which constituted protected activity. *See* 42 U.S.C. § 2000e-3(a) (prohibiting employers from discriminating against employees because they have "made a charge"); *Okoli,* 648 F.3d at 223 (recognizing that the "filing of a complaint with the EEOC" is "protected activity"). Thus, the analysis of the State's conduct after that charge turns to the final two prongs for assessing a retaliation claim: whether

the State took any actions materially adverse to plaintiff, and whether any materially adverse actions were causally related to the filing of the EEOC charge. *Mascone v. Am. Physical Soc'y, Inc.*, 404 Fed. Appx. 762, 765 (4th Cir. 2010).

Perry alleges the following materially adverse actions occurred after she filed her EEOC charge: (1) Ms. Perdue sent an email, advising that her door would be closed and that all requests for purchase orders must be sent to her; (2) the removal of plaintiff's access to computer programs, printer, and State credit card; (3) the reduction in plaintiff's independent work duties following her return from FMLA leave; (4) the "satisfactory" performance evaluations issued in 2016-2017; (5) her receipt of counseling after her email of March 9, 2017; (6) the failure to promote plaintiff to Ms. Perdue's position after her announced retirement; (7) the requirement that she attend a psychiatric evaluation, and her resulting termination.

Plaintiff has adduced no evidence establishing when Ms. Perdue, Mr. Waller, or any other relevant party learned that she had filed an EEOC charge. Although, as discussed herein, her claim fails for other reasons, the lack of such evidence could preclude a finding that any alleged adverse action was causally related to the filing of the EEOC charge, particularly as to the alleged actions occurring around the time of the EEOC charge in February 2016. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case [for retaliation].")

As noted, in a retaliation claim, the standard for a materially adverse action is more lenient than the adverse employment action required for a substantive discrimination claim. *Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not

limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Moreover, as indicated, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

Under those governing principles, several of the actions alleged by plaintiff do not rise to the level of "materially adverse." First, the alleged "hostile" conduct by Ms. Perdue, such as limiting face-to-face conversation and closing her office door, are the type of "normally petty slights, minor annoyances, and simple lack of good manners" that the Supreme Court has determined do not constitute material adversity. *Burlington Northern,* 548 U.S. at 68. Similarly, the delay inherent in reordering plaintiff's State credit card, getting her computer programs reinstalled, and explaining the intervening changes to her printer assignment following her twelve-week medical leave, do not constitute material adversity.

Plaintiff concedes that all of the problems were rectified after some period of time, to permit her to perform her required job duties. ECF 28-22, at 1-2; ECF 31-1 at 19; ECF 31-11 at 3. Moreover, the actual changes to plaintiff's job tasks after her first FMLA leave were more procedural than substantive. Plaintiff acknowledged that, even prior to October 1, 2015, the assignments of new contracts came from either Ms. Perdue or Mr. Waller. ECF 31-1 at 6. The new centralized process for assigning purchase order requests among members of the procurement department (running all assignments through Ms. Perdue instead of allowing individuals to bring

assignments to a particular employee) does not appear to have had a material change in the type of work plaintiff performed. Similarly, the requirement that plaintiff provide status updates on her contracts every two weeks, via a spreadsheet, is not sufficiently onerous so as to constitute a material change in her work. *See Burlington Northern*, 548 U.S. at 68 (action by employer only materially adverse if it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination.") (quotation marks and citations omitted).

Turning to some of Perry's other allegations, reprimands, such as that issued to her in this case with no attached collateral consequences, do not constitute materially adverse actions. Courts within and outside the Fourth Circuit have found that such reprimands are not materially adverse. *See, e.g.*, *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 831-32 (E.D. Va. 2016) (collecting cases); *Wright v. Kent Cnty. Dep't of Soc. Servs.*, Civil Action No. ELH-12-3593, 2014 WL 301026, at *9 (D. Md. Jan. 24, 2014) ("As Judge Paul Grimm of this Court recently noted, even under the 'lower bar' applicable to Title VII retaliation claims, 'none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee AWOL; or issuing a personal improvement plan, an Attendance Warning, a verbal reprimand, a formal letter of reprimand, or a proposed termination.") (quoting *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013)); *see also Thorn v. Sebelius*, 766 F. Supp. 2d 585, 603 (D. Md. 2011) (noting that "unwarranted reprimands" such as "letters of counseling" would not dissuade a reasonable employee from engaging in protected activities.)

Several circuit courts have agreed that a written reprimand, without collateral consequences is not materially adverse. To my knowledge, however, the Fourth Circuit has not expressly addressed the question. *See, e.g.*, *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73

(1st Cir. 2011); *Perry v. Rogers*, 627 Fed. Appx. 823, 832-33 (11th Cir. 2015) (per curiam); *Noack v. YMCA of Greater Houston Area*, 418 Fed. Appx. 347, 353 (5th Cir. 2011) (per curiam); *Allen v. Am. Signature, Inc.*, 272 Fed. Appx. 507, 511 (7th Cir. 2008); *but see Hamby v. Assoc. Ctrs. For Therapy*, 230 Fed. Appx. 772, 778 (10th Cir. 2007) (finding that "an increased number of reprimands" could be materially adverse). The single counseling memorandum issued to plaintiff in this case, which had no collateral consequences, does not rise to the level of material adversity.

The "satisfactory" performance evaluations Ms. Perdue and Mr. Waller issued to plaintiff, similarly, are not materially adverse. The Fourth Circuit has determined that even "poor performance reviews" are not materially adverse. *Parsons v. Wynne,* 221 Fed. Appx. 197, 198 (4th Cir. 2007) (per curiam); *see also Thompson v. Potomac Electric Power Co*., 312 F.3d 645, 652 (4th Cir. 2002) (finding that a slightly diminished performance appraisal that remained within the "Fully Acceptable" rating did not constitute an adverse action). Plaintiff's performance review from Ms. Perdue, in particular, was quite close to the outstanding category. *See* ECF 28-23. And, plaintiff has not alleged any consequences from the "Satisfactory" reviews, such as lack of merit pay or a bonus.

Even viewed in concert, then, the actions described by plaintiff do not establish a situation that would dissuade a reasonable employee from engaging in protected activities. Although it is understandable that plaintiff would have a heightened sensitivity to any workplace changes under the difficult personal circumstances engendered by the email incident, most of plaintiff's allegations are akin to "petty slights, minor annoyances, and lack of good manners," rather than actions which would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citations omitted).

Ultimately, only two of the many actions cited by plaintiff potentially constitute "materially adverse actions": the failure to promote her to a supervisory position, and her termination.

To establish a prima facie case of disparate treatment based on an alleged failure to promote, a plaintiff must show: (1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959-60 (4th Cir.1996); *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005); *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). An employer "has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir. 1992).

Here, plaintiff is unable to establish a prima facie case for three of those four prongs. First, plaintiff did not apply, or seek to apply, to replace Ms. Perdue. ECF 31-5 at 5. Plaintiff's allegations that the process was somehow concealed from her are unfounded, given the evidence that the position was publicly posted on the Department's website. ECF 28-14 at 17. Second, plaintiff cannot establish that she was qualified for the position, given that she was on FMLA leave at the time of the vacancy because she was medically unable to work at Deer's Head. The results of the medical director's examination (finding that plaintiff "is not likely psychologically fit to efficiently perform her job duties") and her sworn statement on her disability application later that year ("I am mentally or physically unable or incapacitated for the further performance of my normal duties of my position and that this incapacity is likely to be permanent") corroborate the notion that, despite her other professional qualifications, she would be unable to fulfill the job requirements for the position at Deer's Head. ECF 31-27 at 4; ECF 28-5 at 42.

Third, plaintiff cannot establish circumstances giving rise to an inference of unlawful discrimination. Ms. Perdue sent the letter announcing her intent to retire on April 6, 2017. ECF 28-27. Plaintiff did not receive the "counseling memo" until the next day, April 7, 2017, and did not take FMLA leave until April 10, 2017. Thus, plaintiff was at work on April 6, 2017, with no known intent to take leave, eliminating the possibility that Ms. Perdue somehow timed her announcement to thwart plaintiff's application.

Moreover, the job vacancy was not solely circulated on Deer's Head email, but was also publicly posted, undermining plaintiff's contention that she was somehow prohibited from learning of the application dates. Thus, plaintiff cannot establish a prima facie case that she was retaliated against by the failure to promote her to fill Ms. Perdue's position.

To be sure, termination is the quintessential example of a materially employment action in the employment context. However, plaintiff is unable to establish the requisite causal connection between her filing of the EEOC charge in February 2016, and her psychiatric evaluation and termination approximately eighteen months later, in August and October of 2017. "To establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998)); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

Notably, a "lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657. Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so

as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (although a period of nine to ten months between the protected conduct and the adverse action "tends to negate the inference of discrimination," the trier of fact could find a causal connection where the defendant declined to hire the plaintiff "at the first available opportunity").

Certainly, in "cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citation omitted). Other circumstantial evidence suggesting retaliatory animus can suffice to establish causation, even in the absence of temporal proximity. *See Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 613 (D. Md. 2012).

However, plaintiff cites neither temporal proximity nor other evidence probative of retaliatory animus. Plaintiff filed her EEOC charge in February 2016, while she was out on her first FMLA leave. ECF 28-24. She was not sent for a psychiatric evaluation at that time. She returned to work in late February 2016, and worked through April 2017. She was not sent for a psychiatric evaluation during that lengthy period, exceeding one year. The evaluation by the State Medical Director was scheduled only when plaintiff exhausted her FMLA leave in 2017, but was not yet medically cleared to return to work. The uncontroverted testimony is that the standard procedure is to send employees in that circumstance for evaluation by the State Medical Director, and plaintiff has adduced no evidence to suggest that the rationale was pretextual.

Moreover, the results of the evaluation justified the termination. Plaintiff advised the State Medical Director that she was unable to return to work at the facility, leading to his finding that

plaintiff "is not likely psychologically fit to efficiently perform her job duties at her current location . . . It is my opinion that Ms. Perry will not likely return to work in her current position at Deer's Head Hospital Center in the near or foreseeable future." ECF 31-27 at 4. Plaintiff then applied for disability retirement, stating under oath: "I am mentally or physically incapacitated for the further performance of my normal duties of my position and that this incapacity is likely to be permanent." ECF 28-5 at 42. Thus, neither the temporal proximity between the EEOC charge and the termination, nor the surrounding circumstances, suggests that the termination was motivated by retaliatory animus. Accordingly, plaintiff has failed to establish the required prima facie case to sustain her retaliation claim.

## V. Conclusion

For the reasons set forth above, I shall grant the State's Motion.

An Order follows, consistent with this Memorandum Opinion.


Dated:  May 17, 2019                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge